**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JENNIFER JONES,           ) Case No. CV 16-1823-JPR
                             )
            Plaintiff,  )
                             ) **MEMORANDUM DECISION AND ORDER**
          v.         ) **AFFIRMING COMMISSIONER**
                             )
NANCY A. BERRYHILL, Acting  )
Commissioner of Social     )
Security,                 )
                             )
           Defendant.  )
                             )

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her application for supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed June 30, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

## II.  BACKGROUND

Plaintiff was born in 1981.  (Administrative Record ("AR") 211.)  She has a college degree in botany and biochemistry.  (AR 85, 228.)  She has worked as a university laboratory technician and a teaching assistant.  (AR 228.)

On March 26, 2013, Plaintiff filed an application for SSI, alleging she had been disabled since April 1, 2010 (AR 211), because of a crushed leg, depression, bipolar disorder, and schizotypal personality disorder (see AR 135).  After her application was denied initially and upon reconsideration (AR 135, 168), she requested a hearing before an Administrative Law Judge (AR 146).  A hearing was held on November 26, 2014, at which Plaintiff, who was represented by counsel, testified, as did her father and a vocational expert.  (AR 80-108.)  In a written decision issued on January 16, 2015, the ALJ found Plaintiff not disabled.  (AR 64-79.)  Plaintiff requested review and submitted additional medical evidence.  (See AR 15-29, 45, 47-63.)  On June 22, 2016, the Appeals Council denied review, finding that the additional evidence did not provide a basis for changing the ALJ's decision.  (AR 1-7.)  The council ordered that the new evidence be made part of the administrative record.  (AR 6.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra

1  <u>v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007). Substantial

2  evidence means such evidence as a reasonable person might accept

3  as adequate to support a conclusion. <u>Richardson</u>, 402 U.S. at

4  401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).

5  It is more than a scintilla but less than a preponderance.

6  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec.</u>

7  <u>Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether

8  substantial evidence supports a finding, the reviewing court

9  "must review the administrative record as a whole, weighing both

10  the evidence that supports and the evidence that detracts from

11  the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715,

12  720 (9th Cir. 1998). "If the evidence can reasonably support

13  either affirming or reversing," the reviewing court "may not

14  substitute its judgment" for the Commissioner's. <u>Id.</u> at 720-21.

15  **IV.  THE EVALUATION OF DISABILITY**

16  People are "disabled" for purposes of receiving Social

17  Security benefits if they are unable to engage in any substantial

18  gainful activity owing to a physical or mental impairment that is

19  expected to result in death or has lasted, or is expected to

20  last, for a continuous period of at least 12 months. 42 U.S.C.

21  § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.

22  1992).

23  A.  <u>The Five-Step Evaluation Process</u>

24  The ALJ follows a five-step sequential evaluation process to

25  assess whether a claimant is disabled. 20 C.F.R.

26  § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir.

27  1995) (as amended Apr. 9, 1996). In the first step, the

28  Commissioner must determine whether the claimant is currently

3

engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.  The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 26, 2013, the application date. (AR 69.) At step two, he concluded that she had only one severe medically determinable impairment: "fracture of the left lower extremity." (Id.) He also found that she had a medically determinable mental impairment, mood disorder, but concluded that it was "nonsevere." (Id.) At step three, he found that she did not have an impairment or combination of impairments falling under a Listing, "specifically consider[ing] listing 1.06." (AR 70.)

At step four, the ALJ found that Plaintiff had the RFC to perform a limited range of light work: she could "lift and/or carry up to 20 pounds occasionally and 10 pounds frequently," "stand and/or walk no more than four hours in an eight-hour workday," "sit without restriction," and "frequently perform pushing or pulling with the upper extremities." (Id.) She "require[d] a cane for long-distance ambulation"; could "occasionally climb, balance, kneel and crawl"; and "should avoid jobs requiring more than occasional negotiation of uneven

terrain, unprotected heights, or the climbing of ladders, ropes or scaffolds." (AR 70-71.) Based on the VE's testimony, the ALJ concluded that she could not perform any past relevant work. (AR 73.) At step five, however, given her "age, education, work experience, and [RFC]," he determined that she could successfully perform numerous light and sedentary jobs available in the national economy. (AR 74-75.) Thus, the ALJ found Plaintiff not disabled. (AR 75.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in (1) evaluating the credibility of her subjective symptom statements, (2) denying the applicability of Listing 1.06 to her leg impairment, and (3) finding her mental impairment nonsevere. (See J. Stip. at 4.) For the reasons discussed below, the ALJ did not err.

A.   The ALJ Properly Assessed the Credibility of
     Plaintiff's Subjective Symptom Statements

The ALJ found that Plaintiff's statements "concerning the intensity, persistence and limiting effects" of her physical and mental symptoms were "not entirely credible." (AR 71.) Plaintiff argues that this finding was improper because the ALJ failed to sufficiently support it. (See J. Stip. at 16-22.) The ALJ, however, based his credibility assessment on clear and convincing reasons. Accordingly, remand is not warranted.

1.   Applicable law

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th

6

Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 96-7p, 1996 WL 374186 (July 2, 1996).[2] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.

---

[2] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 28, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however.

Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

2. Relevant background

a. *Physical limitations*

In 2010, Plaintiff fractured her left femur in a car crash and also sustained several fractures of her right leg. (AR 526.) Though the record contains no documentation of treatment before March 2012 (see AR 71), the fractures apparently required multiple rounds of surgery (see AR 526). In July 2012, she was diagnosed with nonunion of the left-leg fracture and underwent corrective surgery. (AR 441-42.) Following the surgery, in October 2012 she was able to walk and stand for "3-5 minutes" without assistance (AR 384), and in May 2013 she could "ambulate short distances [without] pain" (AR 310). Medical imaging throughout 2013 indicated that the fracture was healing but that

8

union was still incomplete despite stable hardware. (See, e.g., AR 307 (May 2013), 544 (Dec. 2013).) By 2014, medical imaging indicated that the fractured femur was healing and had normal alignment, intact hardware, and "delayed union." (AR 602 (May 2014), 604-05 (Mar. 2014), 608-09 (Jan. 2014).)

In her June 7, 2013 Adult Function Report, Plaintiff indicated that standing was painful (AR 242), and in her November 20, 2013 Disability Report she stated that she could "no longer do things around the house like basic chores" (AR 274). Her report indicated, however, that she had no problem with personal care and could prepare her own meals, wash dishes, go outside "once or twice a week," use public transportation, and walk "a few blocks" with crutches. (AR 243-45, 247.) She also crocheted and played music throughout the day. (AR 246.)

In September 2013, Plaintiff was examined by consulting internist Ulin Sargeant. (AR 526-30.) She reported difficulty walking and said she used crutches "all the time," "for everything even getting up from her bed." (AR 526.) She also reported that she did "not take any medications for the discomfort because she [did] not think that they help[ed] at all," and she was "not getting any intervention," including any treatment, cortisone injections, or physical therapy. (Id.)

Dr. Sargeant observed that with crutches she walked at a normal pace. (AR 527.) But when he asked her to walk or stand without crutches, she refused. (Id.) She also refused to flex her left knee beyond 10 degrees in a supine position but demonstrated a flexion of 90 degrees in a sitting position. (AR 529.) Dr. Sargeant concluded that despite reported "discomfort

in her lower extremities," Plaintiff had "fairly good function" walking with crutches, could even walk "briskly with [them]," and was "able to do a lot of activities more than [he] thought that she could." (Id.) He assessed that she was "able to lift and carry 20 pounds occasionally and 10 pounds frequently"; was "able to walk and stand four hours out of an eight-hour workday"; had "no restrictions" sitting; "should use a cane for long distances"; was "able to walk on uneven terrain, climb ladders, and work at heights occasionally"; and was "able to climb, balance, kneel, and crawl occasionally." (AR 530.)

Dr. Pamela Ombres, a consulting physician[3] who reviewed Plaintiff's medical records in October 2013, noted that a few days after her exam with Dr. Sargeant, Plaintiff "called in stating she was nervous at [the] exam and told them she uses crutches all the time[, but] she uses crutches about 50% of [the] time, mostly out of the house" and not while at home. (AR 114.) Dr. Ombres found that Plaintiff was "capable of a sedentary RFC." (AR 117.) She could "[s]tand and/or walk (with normal breaks) for a total of[] 2 hours," could "[s]it (with normal breaks) for a total of[] [a]bout 6 hours in an 8-hour workday," and required a "[c]rutch for long distance[s]." (Id.)

Dr. M. Gleason, a consulting doctor,[4] reviewed Plaintiff's

---

[3] Dr. Ombres has a specialty code of "28," indicating "[o]phthalmology." (AR 109); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.

[4] Dr. Gleason has a specialty code of "35," indicating "[p]lastic surgery." (AR 121); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.

medical records in February 2014 and reaffirmed her sedentary
RFC. (AR 131.) Dr. Gleason noted that she could "[s]tand and/or
walk (with normal breaks) for a total of[] 4 hours," could "[s]it
(with normal breaks) for a total of[] [a]bout 6 hours in an 8-
hour workday," and required a "[c]rutch for long distance[s]."
(AR 129-30.)

At a December 2013 appointment, Plaintiff was found to have
"normal" range of motion and "flexion/extension" in her left
knee, and she was advised to practice walking with one crutch.
(AR 545; see also AR 558.) In January 2014, she demonstrated
normal range of motion in her left leg and was able to move her
knee 130 degrees (AR 609); she also "request[ed] a note stating
it's ok to swim" (AR 543). And at a March 2014 appointment, she
demonstrated "full" range of motion in her left knee and reported
walking two miles without pain (though she also reported walking
two blocks with some pain around the same time). (AR 605.)

At her November 26, 2014 hearing, Plaintiff testified that
she still had difficulty standing and walking. (AR 84.)
Although she could stand and clean dishes at home for "short
periods of time . . . pain free," she felt pain whenever she
walked any distance "without [her] crutches." (Id.) She
testified that she did not feel pain when seated (AR 90) but also
testified that sitting for "more than an hour" was hard (AR 91).
She indicated that she applied for "dishwasher jobs," "server
jobs," and "clerical positions" but was not hired because she
lacked relevant experience. (See AR 84-85.)

Plaintiff lived with her father, mother, and brother. (AR
99.) Her father testified at the hearing. (AR 94.) He stated

that Plaintiff did some household chores, such as vacuuming, cleaning dishes, and laundry. (AR 95.) But the majority of his testimony concerned her mental health. (See AR 94-100.)[5]

### b. *Mental limitations*

The record contains no psychiatric or mental-health records from before 2012 despite an alleged disability onset date of April 2010. (See AR 71.) Plaintiff's medical records, however, indicate that she had undergone regular treatment for mental-health problems since at least 2008. (See AR 497.) Throughout 2012 and 2013, Plaintiff attended regular therapy sessions with clinical psychologist Joyce Handler. (AR 500-10.) During those sessions, Plaintiff discussed her history of psychiatric hospitalizations, suicidal episodes, and feelings of depression. (Id.) She reported acting violently toward her mother and brother, whom she identified as sources of her anger.[6] (See, e.g., AR 504 (in September 2012 she "became very angry [at her mother] and started throwing things around . . . [and] biting

---

[5] Plaintiff in passing criticizes the ALJ's rejection of her father's hearing testimony. (See J. Stip. at 20-22.) His testimony was given "some weight" by the ALJ, but only "insofar as it corroborate[d]" Plaintiff's symptom statements. (AR 73.) As discussed below, because the ALJ found Plaintiff's symptom statements not fully credible (id.), a finding supported by substantial evidence in the record, the ALJ's partially adverse treatment of her father's testimony was not in error.

[6] Indeed, her mother was apparently at least sometimes a difficult person. She refused to participate in a family therapy session in October 2012 because she was "very angry" at Plaintiff and believed she was "destroy[ing]" their home. (AR 505.) That same month, Plaintiff was hospitalized for a violent episode, and when her mother came to visit, she was "very demanding and intrusive," "cursing and threatening staff," and "had to be escorted out twice." (AR 399.)

her," and in October 2012 she "reported becoming violent during an argument with her brother").) Nonetheless, Plaintiff also reported "connecting with people at church," "volunteering to help with gardening at the church," going "shopping with a new friend she met at the church," feeling "very badly about her violent behavior," seeming "more motivated than ever to stop," and realizing "she had been paranoid." (AR 507-08.)

In March 2013, shortly before the application date, she was admitted to the hospital for inpatient treatment for having suicidal "plan[s] to hang herself or overdose on medications." (AR 319-34.) She reported having a history of bipolar disorder and major depressive disorder. (AR 323.) She also said she had been noncompliant with her medications and felt "like she need[ed] a medication change." (Id. (Plaintiff did not feel that Prolixin[7] or Trileptal[8] was working, and she stopped taking

---

[7] Prolixin is the name-brand version of fluphenazine, an antipsychotic medication used to treat schizophrenia and such psychotic symptoms as hallucinations, delusions, and hostility. See Fluphenazine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682172.html (last updated July 15, 2017).

[8] Trileptal is the name-brand version of oxcarbazepine, an anticonvulsant used to treat seizures and bipolar disorder. See Oxcarbazepine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601245.html (last updated Jan. 15, 2016).

Depakote,[9] Topamax,[10] Zyprexa,[11] and Risperdal[12] because of their side effects); see also AR 374 (Plaintiff was noted in January 2013 to "frequently change her [medication] regimen" on her own).) Plaintiff was given new medications (AR 324), and her treatment records throughout the rest of 2013 indicated she was stable and compliant with the medication. (See, e.g., AR 622 (Dec. 2013), 623 (Oct. 2013), 624 (Sept. 2013); see also AR 561 (Nov. 2013), 563 (Aug. 2013), 565 (July 2013), 567 (Apr. 2013).) Treatment records throughout 2014 demonstrated the same. (See, e.g., AR 613 (Oct. 2014), 615 (July 2014), 617 (May 2014), 619 (Mar. 2014), 620 (Feb. 2014), 621 (Jan. 2014).) Plaintiff was apparently not hospitalized at any point between the application date and the ALJ's decision.

In her June 2013 function report, Plaintiff indicated that

[9] Depakote is the name-brand version of valproic acid, an anticonvulsant used to treat mania. See Valproic Acid, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682412.html (last updated July 15, 2017).

[10] Topamax is the name-brand version of topiramate, an anticonvulsant used to treat seizures, prevent migraines, and manage alcohol dependence. See Topiramate, MedlinePlus, https://medlineplus.gov/druginfo/meds/a697012.html (last updated Jan. 15, 2015).

[11] Zyprexa is the name-brand version of olanzapine, an atypical antipsychotic used to treat the symptoms of schizophrenia and bipolar disorder. See Olanzapine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601213.html (last updated June 15, 2017).

[12] Risperdal is the name-brand version of risperidone, an atypical antipsychotic used to treat the symptoms of schizophrenia, mania, and such other behavioral problems as aggression. See Risperidone, MedlinePlus, https:// medlineplus.gov/druginfo/meds/a694015.html (last updated July 15, 2017).

her "suicidal issues" impaired her concentration. (AR 242.) She stated, however, that she was able to pay bills, handle savings accounts, count change, use a checkbook, and go to church weekly. (AR 245-46.) She took part in church "to the fullest extent." (AR 246.) She indicated that she spent time with others talking on the phone. (AR 246-47.) She also reported that she was capable of paying attention "long enough to work," which was "no different since [her 2010] car crash." (AR 247.)

In October 2013, Plaintiff was examined by consulting psychiatrist Thaworn Rathana-Nakintara. (AR 533-37.) Plaintiff reported having "suicidal feeling[s]" and a history of "bipolar disorder, depression, schizotypal personality disorder, and schizoaffective disorder since 2008." (AR 533.) She also reported having a history of psychiatric hospitalizations and nonhospital psychiatric treatment, and she said she was on medication and currently seeing a psychologist and psychiatrist. (AR 534.) She reported "feeling better since she was discharged from the hospital eight months [earlier]." (AR 536.) Dr. Rathana-Nakintara noted that Plaintiff had "adequate self-care skills," did "household chores," "manage[d] her own money with some help," and could "go places by herself sometimes." (AR 535.) She was also responsive during the examination, maintained good eye contact, and was alert and oriented. (Id.) Dr. Rathana-Nakintara diagnosed Plaintiff with mood disorder. (AR 536.) Plaintiff demonstrated "no difficulties in maintaining social functioning," "no difficulties focusing and maintaining attention," and "no difficulties in concentration, persistence and pace." (AR 537.) Dr. Rathana-Nakintara concluded that she

would have "no limitations performing simple and repetitive tasks"; "no limitations performing detailed and complex tasks"; "no difficulties [performing] work activities on a consistent basis without special or additional supervision"; "no limitations completing a normal workday or workweek due to her mental condition"; "no limitations accepting instructions from supervisors and interacting with coworkers and with the public"; and "no difficulties [handling] the usual stresses, changes and demands of gainful employment." (Id.) Dr. Rathana-Nakintara also noted that Plaintiff was "vulnerable to becom[ing] depressed when she [was] very stressed" in her personal relationships but "not at work." (Id.)

Also at this time Plaintiff's medical records were reviewed by consulting psychologist W. Miller Logan, who concluded that she was not disabled. (AR 113-15, 118-20.) Dr. Logan found that she was moderately limited in her "ability to interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "maintain socially appropriate behavior." (AR 118.) But Dr. Logan also found that she had no limitations with "understanding and memory" or "sustained concentration and persistence" (id.), and she was able to "perform a full range of work activity from a cognitive standpoint but would need a work setting where interactions with coworkers, supervisors, and the public are brief and task focused." (AR 119.) These findings were reaffirmed by Dr. D. Funkenstein, another consulting psychologist who reviewed

16

Plaintiff's medical records, in February 2014. (AR 127-28, 131-33.)

At her November 2014 hearing, Plaintiff testified that she was "very uncomfortable being around people" and had difficulty working with others. (AR 84.) She felt that others "click[ed] their pens" and coughed at her (id.), which caused her stress (AR 89). She testified that she recently took a Spanish class at a local community college, where she noticed others "pen clicking" and felt like she was being sexually harassed (she was not touched by other people but got "these strange tingly feelings"). (AR 87-88.) Plaintiff attended the class for four months for approximately three hours a week and was "very careful" not to miss class. (Id.) She worked with others on group projects and received an "A+" in the course.[13] (AR 87-89.)

Plaintiff's father testified that because of school, she was "leaving the house fairly frequently." (AR 97.) He noted that she talked about "problems with students clicking pens" (id.) and that after interacting with people outside the family, she frequently reflected that she did not feel she "fit in" or would "know what to say" (AR 96-97). He also testified that while she had "never been a particularly social person[,] she interacted well with others" and was a self-motivated "super achiever." (AR 96, 98.)

3. Analysis

Plaintiff argues that the ALJ failed to specifically and sufficiently support his determination that her testimony was

---

[13] Although Plaintiff stated she took only one class (AR 87-88), her father testified that she also took typing (AR 97).

17

only partially credible. (J. Stip. at 16.) Though she points to medical evidence that supports her testimony (see id. at 16-18, 20-21), the substantial weight of the evidence looking at the record as a whole undermines Plaintiff's statements regarding both her physical and mental functional limitations. Moreover, when the record would support a decision either way, a reviewing court may not substitute its judgment for the Commissioner's. Reddick, 157 F.3d at 720-21.

The ALJ identified three reasons why he found Plaintiff not fully credible: (1) the "extent" of her reported limitations was "not fully supported by the objective evidence of record" (AR 73); (2) her activities of daily living were inconsistent with her reported functional limitations (AR 71); and (3) her periods of "symptom exacerbation are associated with periods of poor medication compliance" (AR 73). Each was a legally sufficient reason for discounting her credibility.

> a.  *Reported limitations inconsistent with*
> *objective evidence*

First, the ALJ properly found some of Plaintiff's symptom statements lacking in credibility and unsupported by the record, as to both her physical and mental functioning. As identified by the ALJ, Plaintiff alleged that she had "difficulty with standing/walking due to her leg impairment." (AR 71.) At her hearing, she testified that she walked with crutches, would feel pain while standing or walking, and had a "hard time sitting for long." (AR 90-91.)

Plaintiff's medical records, however, indicated that her condition was improving and not disabling. As the ALJ noted,

"[m]edical imaging" in early 2014 showed "stable alignment of the femur," "intact hardware," and "stable overall alignment." (AR 73 (citing AR 602, 604, 608).) Indeed, medical examinations throughout 2013 and 2014 showed that her left-femur fracture was healing despite a delayed union, her hardware was consistently intact and stable, and her left knee's range of motion had increased to full capacity. (See, e.g., AR 307, 602.) She was able to walk and stand for "3-5 minutes" without assistance in October 2012 (AR 384), could "ambulate short distances [without] pain" in May 2013 (AR 310), and — based on the September 2013 medical opinion of Dr. Sargeant, to which the ALJ gave "great weight" (AR 73) and which Plaintiff does not directly challenge — could walk, stand, and sit effectively. (AR 530.) Even though Plaintiff told Dr. Sargeant she could not walk at all without crutches (AR 526), she shortly thereafter acknowledged that she had not told Dr. Sargeant the truth and used crutches only "50% of [the] time" (AR 114). This admission casts in a suspect light Plaintiff's refusal to even attempt walking without crutches for Dr. Sargeant or to flex her knee for him.

Moreover, Plaintiff's physical abilities continued to improve following her July 2012 surgery. By March 2014, she achieved full range of motion in her left leg and had requested a note approving her to swim, further demonstrating her increased mobility. (AR 543, 605; see also AR 545, 609.) She reported walking two miles without pain. (AR 605.) Though she appears to have sometimes reported pain in her left leg (see, e.g., AR 84, 242, 536), her medical records indicated that she could occasionally walk with lessening or no pain (see, e.g., AR 310,

19

530, 605).  As the ALJ noted (AR 72), Plaintiff also reported that she did not take medication for the pain or seek treatment or therapy, evidence which itself suggests that her pain testimony was properly discounted (see AR 526).  See Molina, 674 F.3d at 1113 (holding that "ALJ may properly rely on 'unexplained or inadequately explained failure . . . to follow a prescribed course of treatment'" to discount claimant's credibility (quoting Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)); Beck v. Astrue, 303 F. App'x 455, 458 (9th Cir. 2008) (upholding adverse credibility determination when plaintiff "failed to follow a recommended treatment plan").  Finally, when reviewed by two consulting physicians, her medical records showed that she needed a "[c]rutch" for long-distance ambulation and could otherwise sit, stand, and walk.  (AR 117, 129-30.)  Plaintiff's medical records therefore provide substantial evidence supporting the ALJ's finding that her physical-symptom statements were not fully credible.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

The ALJ also properly found Plaintiff's mental-symptom statements not fully credible and unsupported by the record.  As identified by the ALJ, Plaintiff alleged that she had "impaired concentration as a result of her mental health symptoms."  (AR 71.)  She testified at her hearing that she had "a lot of trouble

focusing" (AR 92-93), and in her function report she specified that her concentration was impaired because of her "suicidal issues" (AR 242). These statements, however, were inconsistent with Plaintiff's medical records and activities.

After a formal psychiatric examination in October 2013, Dr. Rathana-Nakintara concluded that Plaintiff had "no difficulties focusing[,] maintaining attention," or "concentrat[ing]." (AR 537.) She was capable of performing both simple and complex tasks, and she had "no limitations" on her ability to complete a "normal workday or workweek" because of her mental condition (id.), which was diagnosed as mood disorder (AR 536). Plaintiff challenges Dr. Rathana-Nakintara's opinion as "incomplete," claiming that it failed to address her other "personality disorder" diagnoses. (J. Stip. at 37.) But the ALJ correctly found that Dr. Rathana-Nakintara's evaluation was corroborated by both the examination itself and the record as a whole. (AR 73); see Thomas, 278 F.3d at 957; accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). During the examination, for example, Plaintiff completed "serial sevens subtraction . . . down from 100 to two," which she did "with no mistake at all." (AR 535.) She did "the same on serial threes subtraction" and "was able to spell the word 'world' forward and backward easily." (Id.) Similarly, Dr. Rathana-Nakintara observed that Plaintiff exhibited "no difficulty interacting with the clinic staff or [herself]," contributing to the conclusion that she had "no difficulties in maintaining social functioning." (AR 537.) The ALJ accordingly afforded "great weight" to Dr. Rathana-Nakintara's findings. (AR 73.) Plaintiff's mental-

21

symptom allegations were therefore not supported by her medical records.  See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Burch, 400 F.3d at 681.

Her activities, too, showed that her concentration was not impaired.  She received an A+ in her Spanish class (AR 87), which included group projects, and spent long periods playing music and crocheting (AR 246).  In her function report, she admitted being capable of paying attention "long enough to work," and she said her attention span was "no different" than before the alleged disability onset date.  (AR 247.)  Her function report also indicated that she was capable of paying bills and handling savings accounts (AR 245), which was corroborated by Dr. Rathana-Nakintara's psychiatric evaluation (see AR 535).  Plaintiff was also found to have no limitations with "understanding and memory" or "sustained concentration and persistence" by Drs. Logan and Funkenstein, consulting psychologists who reviewed her medical records and found her not disabled.  (AR 118, 131-32.)  Thus, Plaintiff's reported limitations with focus and concentration were unsupported by the record, and the ALJ properly discounted her credibility in this regard.  See Carmickle, 533 F.3d at 1161; Burch, 400 F.3d at 681.

b.  *Daily activities*

As the ALJ found (AR 71) and as discussed briefly above, Plaintiff's symptom statements were also undermined by her contradictory reports of engaging in "activities including self-care, housework, errands (including use of public transportation), and social and leisure activities" (id.).  An

22

ALJ may properly discount the credibility of a plaintiff's

subjective symptom statements when they are inconsistent with her

daily activities.  See Molina, 674 F.3d at 1112 (ALJ may

discredit claimant's testimony when "claimant engages in daily

activities inconsistent with the alleged symptoms" (citing

Lingenfelter, 504 F.3d at 1040)).  "Even where those [daily]

activities suggest some difficulty functioning, they may be

grounds for discrediting the claimant's testimony to the extent

that they contradict claims of a totally debilitating

impairment."  Id. at 1113.

Despite Plaintiff's allegations of pain while standing and

walking, both she and her father testified that she could engage

in a range of housework, including cleaning dishes, doing

laundry, and vacuuming.  (AR 84, 95, 244.)  She and her father

also stated that she could regularly and independently travel to

church and school (AR 97, 245-46), and she indicated that she had

no problems with personal care, preparing her own meals, or using

public transportation (AR 243-45).  Her father testified that she

left the house "fairly frequently."  (AR 97.)

Her allegations of difficulty sitting (see, e.g., AR 91)

were similarly contradicted by her statements that she did not

feel pain when seated (AR 90) and spent her days "sitting longer"

while crocheting and playing music (AR 246).  Medical records

further corroborated her ability to stand, walk, and sit.  (See,

e.g., AR 117, 129-30, 530, 605.)  She also attended school for

four months, never missing a class, and received an A+ in the

course.  (AR 87-89.)  She apparently took a second class, typing.

(AR 97.)  Thus, the record contains substantial evidence of

Plaintiff's functional activity, undermining her physical-symptom statements and supporting the ALJ's adverse credibility determination.  See Matthews v. Shalala, 10 F.3d 678, 679-80 (9th Cir. 1993) (upholding ALJ's finding that claimant's pain testimony was undermined by his housecleaning, "including vacuuming and dishwashing"; light gardening; shopping; and attending school three days a week, "an activity which is inconsistent with an alleged inability to perform all work").

Moreover, to the extent Plaintiff alleges disability because she was unable to be around others, the record shows otherwise. Dr. Rathana-Nakintara indicated that she had "no difficulties in maintaining social functioning," had "no limitations . . . interacting with coworkers and with the public," and experienced stress in personal relationships rather than at work.  (AR 537.) Plaintiff testified to working with others in group projects as part of her Spanish class, which she did successfully given the "A+" she received in the course. (AR 87-89.)  Her father, too, testified that she interacted well with others despite her self-reported difficulty with such interactions.  (AR 96-98.) Plaintiff reported spending time with others by talking on the phone, going to church weekly, and taking part in church "to the fullest extent" (AR 246),[14] activities which she had also

---

[14] Plaintiff contends that the church "could not deal with her." (J. Stip. at 21 (citing AR 498, 509).)  AR 498 states only that Plaintiff reported that her church activities "elevate her mood."  AR 509 states only that she stopped going to the Mormon Church and was trying out other religions.  On AR 508, Plaintiff reported that the pastor of her church did not have as much time to spend with her as she wanted, and she "felt bad but understands."  That hardly equates to the church being "unable to deal with her."

reported to her therapist, Dr. Handler (AR 507-08 (Plaintiff connected with people at church, volunteered, and went shopping with a friend from church)). Thus, both her medical records and demonstrated activities of daily living undermined Plaintiff's statements that she was unable to work, concentrate, or be around others. *See* Womeldorf v. Berryhill, 685 F. App'x 620, 621 (9th Cir. 2017) (upholding ALJ's discounting of plaintiff's credibility in part because his activities of daily living "were not entirely consistent with his claimed inability to engage in social interactions").

          c.   *Noncompliance with treatment and medications*

The ALJ specifically noted how Plaintiff's instances of exacerbated mental-health issues were "associated with periods of poor medication compliance." (AR 73; see also AR 323, 374.) For example, during Plaintiff's March 2013 hospitalization, she reported being noncompliant with her depression medication. (AR 323.) Thereafter, during the relevant period, she reported compliance with her medication (see, e.g., AR 561), and no subsequent instances of hospitalization occurred. In fact, no psychiatric records during the relevant period substantiated Plaintiff's claims of impaired concentration caused by mental-health problems. *See* Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

For all these reasons, the ALJ's adverse credibility determination of Plaintiff's symptom statements is supported by substantial evidence. Plaintiff is therefore not entitled to

1 remand on this ground.[15]

2  B.  The ALJ Properly Found that Plaintiff's Physical

3  Impairment Did Not Meet or Equal Listing 1.06,

4  "Fracture of a Femur"

5  Plaintiff argues that the ALJ erred in finding that her

6 impairment did not fall under Listing 1.06 because her medical

7 records "establish incomplete union" of her left femur fracture.

8 (J. Stip. at 5.)  As discussed below, however, the ALJ did not

9 err.

10  1.  Applicable law

11  At step three of the disability evaluation process, the ALJ

12 must evaluate the claimant's impairments to see if they meet or

13 medically equal any of those in the Listings.  See

14 § 416.920(a)(4)(iii); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th

15 Cir. 1999).  Listed impairments are those that are "so severe

16 that they are irrebuttably presumed disabling, without any

17 specific finding as to the claimant's ability to perform his past

18 relevant work or any other jobs."  Lester, 81 F.3d at 828 (citing

19 § 404.1520(d)).

20  The claimant has the initial burden of proving that an

21 impairment meets or equals a Listing.  Molina, 674 F.3d at 1110;

22

23  [15] The ALJ may have erred in finding Plaintiff's treatment
24 with antipsychotic medication to be "conservative."  (AR 73.)
But even if the ALJ was wrong, see, e.g., Childress v. Colvin,
25 No. EDCV 14-0009-MAN, 2015 WL 2380872, at *14 (C.D. Cal. May 18,
2015) (finding treatment of prescription antidepressants,
26 prescription antipsychotics, and talk therapy not properly
characterized as conservative), he did not err in concluding that
27 it was largely effective.  Moreover, as discussed above, the ALJ
gave other legally sufficient reasons for partially discounting
28 Plaintiff's credibility.

Burch, 400 F.3d at 683 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)). "To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim." Tackett, 180 F.3d at 1099 (emphasis in original). "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a claimant's impairment is not listed, then to the listed impairment 'most like' the claimant's impairment." Id. (quoting § 404.1526 (emphasis in original)). Medical equivalence, moreover, "must be based on medical findings"; "[a] generalized assertion of functional problems is not enough to establish disability at step three." Id. at 1100 (citing § 404.1526).

An ALJ "must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001). The ALJ need not, however, "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990). The ALJ does not err by discussing the evidence supporting his conclusion only in other sections of his decision. See id. at 1200-01 (finding no error when ALJ failed to state or discuss evidence supporting conclusion that claimant's impairments did not satisfy Listing but "made a five page, single-spaced summary of the record"); Lewis, 236 F.3d at 513 (ALJ required "to discuss and evaluate the evidence that supports his or her conclusion," but no error when ALJ does not "do so

27

under the heading 'Findings'"). Moreover, the ALJ "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch, 400 F.3d at 683.

An ALJ's decision that a claimant did not meet a Listing must be upheld if it was supported by "substantial evidence." See Warre, 439 F.3d at 1006. Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam) (citing Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). When evidence is susceptible of more than one rational interpretation, the Court must uphold the ALJ's conclusion. Id.

Listing 1.06 requires the following:

Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With:

A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and

B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.06.

The "[i]nability to ambulate effectively" is the "extreme limitation of the ability to walk." Id. § 1.00(B)(2)(b)(1). The impairment must prevent "independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of

28

both upper extremities." Id. "[I]neffective ambulation"
includes "the inability to walk without the use of . . . two
crutches or two canes." Id. § 1.00(B)(2)(b)(2).

### 2. Relevant background

Plaintiff was involved in a car accident in 2010 and
underwent several rounds of surgery for fractures in her left and
right legs. (See AR 526.) In July 2012, the fracture in her
left femur was diagnosed as a nonunion, and she underwent
corrective surgery. (AR 441-42.) In October 2012 she
demonstrated independent ambulation and the ability to stand for
"3-5 minutes" (AR 384), and in March 2013 — when she filed her
SSI application — she could walk "short distances [without] pain"
(AR 310). Medical imaging throughout 2013 indicated that
Plaintiff's left-leg fracture was healing but continued to
exhibit nonunion despite stable hardware. (See, e.g., AR 307,
544.) In 2014, medical imaging showed "delayed union" of the
femur, with normal alignment and intact hardware. (AR 602, 604-
05, 608-09.)

Plaintiff's examination with Dr. Sargeant in September 2013
showed that she ambulated effectively with crutches, but she
refused to even attempt to walk without them (see AR 527-30)
despite recent reports that she was able to do so at least
briefly, as noted above (see, e.g., AR 310, 384). Plaintiff
later admitted that she had not told the truth to Dr. Sargeant
when she said she needed crutches "for everything" (AR 526) and
in fact used them only 50 percent of the time (AR 114). Dr.
Sargeant found that Plaintiff should walk with a cane for long
distances but otherwise was unimpeded in walking for up to four

29

hours a day.  (AR 530.)  Physical examinations in 2013 and 2014 showed continued improvement to the point of "full weight bearing" (AR 609) and indicated that she could walk at least short distances without pain and only occasionally required one crutch.  (AR 545, 605.)  Consulting physicians Ombres and Gleason, after reviewing her medical records, also found that Plaintiff should walk with a "[c]rutch for long distances" but otherwise had no walking limitations for up to two to four hours a day.  (AR 117, 129-30.)

### 3. Analysis

The ALJ properly concluded that Plaintiff failed to establish that her leg impairment met or equaled Listing 1.06. Specifically, he found that "[w]hile the record does document nonunion of the claimant's femur in medical imaging, the evidence does not show an inability [to] ambulate effectively or an expectation of inability to ambulate within 12 months."  (AR 70.)

Plaintiff's medical records indicate that her left-leg fracture did not result in a solid union.  (See AR 307, 544, 602, 608-09.)  The ALJ considered this in his decision, stating that the "record does document nonunion of the claimant's femur in medical imaging."  (AR 70.)  Thus, to the extent Plaintiff argues that the ALJ did not find nonunion (see J. Stip. at 6-9), remand is unwarranted.  Substantial evidence in the record supports the ALJ's finding that solid union of her left-leg fracture was not evident.

But the ALJ also found that Plaintiff did not present evidence showing "an inability [to] ambulate effectively."  (AR

70.)  This finding is supported by substantial evidence.[16]
Though the record contains reports of leg pain from Plaintiff
(see, e.g., AR 84, 242, 536), ample evidence establishes that she
could walk effectively.  In September 2013, she admitted that she
used crutches only 50 percent of the time (AR 114), and Dr.
Sargeant assessed that to walk long distances she needed only a
cane (AR 530).  By January 2014, she was expected to be fully
weight bearing in four to six weeks.  (AR 609.)  Indeed, in March
of that year she reported walking two miles without pain.  (AR
605.)  She and her father also reported that she engaged in
activities supporting the inference that she could walk
effectively, such as completing household chores like vacuuming
and going to school and church.  (See, e.g., 95, 243-45.)  Thus,
substantial evidence supports the conclusion that Plaintiff could
walk effectively.[17]  See Warre, 439 F.3d at 1006.

Moreover, during her September 2013 physical examination,
when she was asked to walk without crutches, she refused, saying
that she needed crutches "for everything."  (AR 526-27.)  She
then called in admitting that she had lied and that she needed
crutches only 50 percent of the time.  (AR 114.)  Indeed,

[16] Plaintiff seems to argue only that she was unable to
ambulate effectively "through at least December 23, 2013" (J.
Stip. at 9), apparently conceding that no evidence shows she
couldn't after that date.  March 2013, the application date, to
December of the same year is less than the 12 months necessary to
show disability.

[17] Plaintiff undermines her own argument by acknowledging
that she could walk with only one crutch.  (See J. Stip. at 9.)
While walking only with the assistance of two crutches qualifies
under Listing 1.06 (see 20 C.F.R. pt. 404, subpt. P, app. 1
§ 1.00(B)(2)(b)(2)), walking with one crutch does not, see id.

31

Plaintiff had earlier told her doctors she could walk three to five minutes and "short distances" without pain. (AR 310 (May 2013), 384 (Oct. 2012).) Thus, substantial evidence supports the ALJ's finding that Plaintiff failed to provide evidence establishing her inability to ambulate effectively. See <u>Huizar v. Astrue</u>, No. CV 11-7246-PLA, 2012 WL 3631526, at *7 (C.D. Cal. Aug. 23, 2012) (finding that plaintiff did not demonstrate inability to ambulate effectively because there was no "evidence in the record to support . . . that in order to ambulate at all, she requires two canes, or any other assistive device that limits the functioning of both upper extremities").

Remand is therefore unsupported on this ground.

C.   <u>The ALJ Properly Found Plaintiff's Mental Impairment Nonsevere</u>

Plaintiff argues that the ALJ failed to properly evaluate her "longitudinal mental impairment," including depression, bipolar disorder, schizotypal personality disorder, and schizoaffective disorder. (J. Stip. at 28.) For the reasons discussed below, however, the ALJ did not err. Moreover, any error was harmless.

1.   <u>Applicable law</u>

The step-two inquiry is "a de minimis screening device to dispose of groundless claims." <u>Smolen</u>, 80 F.3d at 1290. The claimant has the burden to show that she has one or more "severe" medically determinable impairments that can be expected to result in death or last for a continuous period of at least 12 months, as demonstrated by evidence in the form of signs, symptoms, or laboratory findings. <u>See</u> §§ 416.905, 416.920(a)(4)(ii); <u>Ukolov</u>

v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). A medically determinable impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."[18] § 416.920(c); see also § 416.921(a). "An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Smolen, 80 F.3d at 1290 (emphasis in original)). A court must determine whether substantial evidence in the record supported the ALJ's finding that a particular impairment was not severe. Davenport v. Colvin, 608 F. App'x 480, 481 (9th Cir. 2015) (citing Webb, 433 F.3d at 687); see also Kent v. Astrue, 335 F. App'x 673, 674 (9th Cir. 2009) (same). Moreover, a step-two error is harmless when the ALJ considered any resulting limitations later in the sequential evaluation process, at step four. See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (as amended); Bickell v. Astrue, 343 F. App'x 275, 278 (9th Cir. 2009).

  2. Additional relevant background

  Plaintiff's recent medical records, submitted for the first time to the Appeals Council, indicated that she was compliant with her medications and regularly reported "doing alright."

---

[18] "Basic work activities" include, among other things, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" and "[c]apacities for seeing, hearing, and speaking." § 416.922(b); accord Yuckert, 482 U.S. at 141.

33

(See, e.g., AR 54 (Apr. 2016), 56 (Jan. 2016), 57 (Dec. 2015), 58 (Nov. 2015), 59 (Sept. 2015), 60 (July 2015), 61 (May 2015), 62 (Apr. 2015), 63 (Feb. 2015).) Plaintiff was evaluated in June 2015 by psychiatrist Than Myint.[19] (AR 18-29.) Dr. Myint apparently did not conduct a formal psychiatric examination at the time but found that Plaintiff had "extreme" limitations understanding, remembering, and carrying out instructions (AR 18) and "difficulty with interpersonal relationships" and "concentrating and focusing due to intrusive thoughts" (AR 22-23). Dr. Myint also found, however, that she could respond appropriately to supervision, coworkers, and work pressures in a work setting (AR 18) and was competent to manage funds on her own (AR 24).

### 3. Analysis

The ALJ properly found that Plaintiff had a medically determinable mental impairment, mood disorder, but that it caused no more than "minimal limitation" and therefore was not severe. (AR 69-70.) Substantial evidence supports that determination, as discussed below. And any error in not identifying any other mental impairments at step two was harmless because the ALJ

---

[19] The record contains treatment notes from Dr. Myint dating at least as far back as 2012. (See, e.g., AR 303.) The record also contains medication-support documentation signed by Dr. Myint since at least 2011. (See, e.g., AR 290-91, 518, 612, 625-26.) Though the majority of those records are illegible (see, e.g., AR 292-303, 519-23, 613-24), those that can be read indicate that Plaintiff was regularly compliant with her medications (see, e.g., AR 292 (May 2013), 293 (Apr. 2013), 295 (Feb. 2013), 296 (Jan. 2013), 302 (May 2012), 519 (Jan. 2014), 520 (Dec. 2013), 521 (Oct. 2013), 522 (Sept. 2013), 523 (July 2013), 613 (Oct. 2014), 615 (July 2014), 617 (May 2014), 619 (Mar. 2014), 620 (Feb. 2014), 621 (Jan. 2014).)

thoroughly discussed and considered all of Plaintiff's mental
limitations.

As a preliminary matter, Plaintiff argues that the evidence
submitted for the first time to the Appeals Council supports her
position that her mental conditions were severe. (J. Stip. at
39-40.) Social Security Administration regulations "permit
claimants to submit new and material evidence to the Appeals
Council and require the Council to consider that evidence in
determining whether to review the ALJ's decision, so long as the
evidence relates to the period on or before the ALJ's decision."
Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th
Cir. 2012); see also § 416.1470(b). "[W]hen the Appeals Council
considers new evidence in deciding whether to review a decision
of the ALJ, that evidence becomes part of the administrative
record, which the district court must consider when reviewing the
Commissioner's final decision for substantial evidence." Brewes,
682 F.3d at 1163; accord Taylor v. Comm'r of Soc. Sec. Admin.,
659 F.3d 1228, 1232 (9th Cir. 2011); see also Borrelli v. Comm'r
of Soc. Sec., 570 F. App'x 651, 652 (9th Cir. 2014) (remand
necessary when "reasonable possibility" exists that "the new
evidence might change the outcome of the administrative
hearing").

Medical examinations that take place after the ALJ's
decision may still relate to a claimant's conditions "during the
relevant time period." Handy v. Colvin, No. CV 14-02149-SH, 2014
WL 4895678, at *3 (C.D. Cal. Sept. 30, 2014). In such a case,
the Appeals Council errs by dismissing the evidence solely
because it is dated after the ALJ's decision. See id.; see also

<u>Baccari v. Colvin</u>, No. EDCV 13-2393 RNB, 2014 WL 6065900, at *2
(C.D. Cal. Nov. 13, 2014) (finding fact that claimant submitted
evidence to Appeals Council that was "generated after the ALJ's
decision . . . is not dispositive of whether the evidence was
chronologically relevant"). This is especially true when the
condition is "chronic" or relatively "longstanding." <u>See</u>
<u>Baccari</u>, 2014 WL 6065900, at *2; <u>Bergmann v. Apfel</u>, 207 F.3d
1065, 1070 (8th Cir. 2000) (finding that posthearing evidence
required remand because it concerned deterioration of "relatively
longstanding" impairment).

As the Appeals Council found (AR 2), the new evidence
submitted to it did not relate to the relevant time period — from
Plaintiff's March 26, 2013 application date to January 16, 2015,
the date of the ALJ's decision — and thus did not bear on the
severity determination made by the ALJ. Plaintiff admitted that
the "new evidence . . . may not relate back in time to the period
adjudicated by [the] ALJ." (AR 16.) Indeed, the new records
reflect Plaintiff's stability and compliance with medication
since February 2015 (<u>see, e.g.</u>, AR 54, 56-63) and provide an
additional psychiatric evaluation completed in June 2015 (AR 18-
24). The latter is written in the present tense, indicating that
it assesses Plaintiff's limitations as of June 2015, five months
after the ALJ's decision. (<u>Id.</u>); <u>see also</u> <u>Serna v. Berryhill</u>,
No. SA CV 17-0394-E, 2017 WL 4142295, at *5 (C.D. Cal. Sept. 18,
2017) (upholding ALJ who discounted medical opinion written in
present tense and which did not state that it applied
retrospectively (citing <u>Lombardo v. Schweiker</u>, 749 F.2d 565, 567
(9th Cir. 1984) (per curiam)); <u>Lewis v. Colvin</u>, No. 12CV2073 AJB

(RBB), 2013 WL 4517252, at *26 (S.D. Cal. Aug. 21, 2013) (holding that medical opinion in present tense and making no reference to relevant time period provided no basis for reversing ALJ's decision or remanding).  Indeed, the evaluation nowhere indicates that it related back to the relevant time period.  <u>Bales v. Berryhill</u>, 688 F. App'x 495, 496 (9th Cir. 2017) (holding new evidence not relevant when it did "not indicate that [it] relate[d] back to the relevant period"); <u>see also</u> <u>Vincent ex rel. Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984) ("After-the-fact psychiatric diagnoses are notoriously unreliable.").

Moreover, the evaluation is undermined by inconsistences internally and with the record, and it accordingly "does not change the fact that substantial evidence supports the ALJ's decision." <u>Kohansby v. Berryhill</u>, __ F. App'x __, No. 14-35926, 2017 WL 3971459, at *2 (9th Cir. Sept. 8, 2017).  First, Dr. Myint assessed only "extreme" and "marked" limitations in Plaintiff's cognitive and social functioning, and yet the evaluation also found Plaintiff capable of responding appropriately to supervision, coworkers, and work pressures in a work setting (<u>see</u> AR 18-19) and stated that she could handle her own funds (AR 24).  Second, the evaluation stated that Plaintiff was completely unable to concentrate or stay focused (AR 29), yet she received an A+ in a community-college Spanish course (AR 87) and acknowledged that her alleged disability had not affected her ability to pay attention (AR 247).  Third, Plaintiff's noted extreme limitations are unsupported by Dr. Myint's own treatment notes, which just document medication support and her regular

compliance with medication. (See, e.g., AR 54-63.) Fourth, Dr.
Myint apparently treated Plaintiff since 2011 (see AR 21), and
his evaluation appears to rely on an earlier history of
hospitalizations occurring outside the relevant application
period (id.). Thus, as noted by the Appeals Council, the new
evidence did not impact the ALJ's findings regarding Plaintiff
during the relevant period. (AR 2.)

　　　　As discussed by the ALJ, "the evidence of record dating from
the period at issue [did] not support a finding that the claimant
[had] consistently experienced more than minimal work-related
functional limitation as a result of any mental health
symptomatology." (AR 69-70.) Plaintiff's medical records showed
that despite a prior history of psychiatric hospitalization,
suicidal ideation, and associated periods of "poor medication
compliance" (AR 70; see also, e.g., AR 319-34, 497, 500-10),
regular treatment and medication stabilized her condition. For
example, Plaintiff was seen throughout 2013 and 2014 and
consistently reported "doing alright," being "stable," and
complying with her medication. (See, e.g., AR 561 (Nov. 2013),
563 (Aug. 2013), 565 (July 2013), 567 (Apr. 2013), 613 (Oct.
2014), 615 (July 2014), 617 (May 2014), 619 (Mar. 2014), 620
(Feb. 2014), 621 (Jan. 2014), 622 (Dec. 2013), 623 (Oct. 2013),
624 (Sept. 2013).) Moreover, as recognized by the ALJ (AR 69-
70), the record contains no evidence of psychiatric
hospitalization during the relevant period. See Davenport, 608
F. App'x at 481 (affirming ALJ's determination that claimant's
mental impairments were not severe during relevant period in part
because treatment notes indicated that claimant's "depression and

anxiety were either mild or improved with treatment"). And as
previously discussed, Plaintiff's activities of daily living
confirmed that any mental impairment was not severe. Finally, in
her October 2013 psychiatric evaluation, Dr. Rathana-Nakintara
found Plaintiff capable of social functioning, focusing, and
maintaining attention. (AR 537.) She was assessed as having "no
limitations" in her psychological work-related functions (see
id.; see also AR 70), and those findings were confirmed by the
opinions of consulting psychologists Logan and Funkenstein (AR
119, 132), which were afforded "significant weight" by the ALJ
(see AR 73). The record therefore provides substantial evidence
that Plaintiff's mental condition improved and was not severe
during the relevant period. See Fry v. Comm'r Soc. Sec., No.
2:15-cv-2023-KJN (PS), 2017 WL 999459, at *3 (E.D. Cal. Mar. 15,
2017) (holding that ALJ did not err in finding Plaintiff's
plantar fasciitis not severe in part because condition had
improved before relevant period), appeal filed, No. 17-15701 (9th
Cir. Apr. 12, 2017).

Even had the ALJ erred in his severity determination, the
error was likely harmless. In assessing Plaintiff's RFC, the ALJ
considered and discussed Plaintiff's mental functioning at
length. (See AR 71-73.) Thus, any error at step two was
harmless. See Lewis, 498 F.3d at 911; Bickell, 343 F. at 278.
Moreover, the VE testified that a person possessing the RFC
assessed by the ALJ but also limited to only "occasional contact
with supervisors, coworkers and the public" could still perform
numerous jobs available in the economy, including many of those
cited by the ALJ in his decision. (See AR 104; see also AR 75.)

Thus, any error in the ALJ's step-two determination was harmless for this additional reason. See Bickell, 343 F. at 278; Lewis, 498 F.3d at 911; Tommasetti, 533 F.3d at 1038 (error is harmless when it is "inconsequential to the ultimate nondisability determination"); cf. Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 536 (6th Cir. 2001) (finding error harmless when ALJ did not discuss opinion of treating physician but VE took relevant limitations into consideration anyway).

Thus, for all these reasons, Plaintiff is not entitled to remand on this ground.

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[20] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: October 13, 2017

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[20] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."